IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

GERARDO PINEDO, SR., §
INDIVIDUALLY AND ON BEHALF §
OF THE ESTATE OF GERARDO §
PINEDO, JR., §
 §
Plaintiff, §
 § Civil Action No. 3:14-CV-0958-D
VS. §
 §
THE CITY OF DALLAS, TEXAS, et al., §
 §
Defendants. §

MEMORANDUM OPINION
AND ORDER

In this action by plaintiff Gerardo Pinedo, Sr. ("Pinedo") arising from the use of

deadly force against his son by police officers, defendant City of Dallas, Texas (the "City")

moves to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief

can be granted. For the reasons that follow, the court grants the motion and dismisses

Pinedo's action against the City by Rule 54(b) final judgment filed today.

I

Because this case is the subject of a prior memorandum opinion and order, *see Pinedo*

*v. City of Dallas*, 2015 WL 221085 (N.D. Tex. Jan. 15, 2015) (Fitzwater, J.) ("*Pinedo I*"),

the court will recount only the background facts and procedural history that are pertinent to

this decision.

A

Pinedo brings this action individually, and on behalf of the estate of his deceased son Gerardo Pinedo, Jr. ("Junior"), against defendants the City, Jamal Robinson ("Officer Robinson") and Mark Meltabarger ("Officer Meltabarger"). Officers Robinson and Meltabarger are both police officers employed by the Dallas Police Department ("DPD").

According to Pinedo's second amended complaint,[1] in 2013 Officers Robinson and Meltabarger were the first officers to respond to a 911 call from an individual who had heard noises coming from an adjacent residence and believed there was an intruder inside. Officer Robinson was in the field training program in his first phase of training under the supervision of Officer Meltabarger. Officers Robinson and Meltabarger were both armed with pepper spray, a taser, a baton, and a firearm. Junior was lawfully within the residence, was unarmed, and did not have any weapon or device on his person that could be perceived as a weapon.

Pinedo alleges that, prior to the shooting, Officers Robinson and Meltabarger observed and heard Junior engaging in behavior that suggested that his thoughts, perceptions, judgments, and emotions were substantially impaired, that he was suffering from a mental illness or cognitive impairment, and that he needed medical or psychological assistance. At

---

[1]In deciding Pinedo's Rule 12(b)(6) motion, the court construes the second amended complaint in the light most favorable to Pinedo, accepts all well-pleaded factual allegations, and draws all reasonable inferences in his favor. *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

some point after Officers Robinson and Meltabarger arrived at the residence, Junior exited the home and proceeded to run in a circle, curl himself up into a ball, and pound his fists on the ground. Pinedo alleges that the DPD had reason to know that Junior had a history of mental illness, because DPD officers had previously responded to more than ten calls at the residence involving members of the Pinedo family, and on one occasion had taken Junior to a psychiatric hospital after finding him at the residence, crying and depressed. Pinedo alleges that at the time of the shooting, Junior was suffering from depression.

Attached to Pinedo's second amended complaint is the affidavit of Raul Alvarado Ramirez ("Ramirez"), who lives next door to the residence. According to Ramirez, between 9:50 p.m. and 10:00 p.m. on the occasion in question, he heard a gun shot, looked out a window to view the property next door, and observed a person (Junior) lying flat on the ground. Ramirez also observed three officers standing around the body, one of whom shined a flashlight on the body while another aimed a rifle at it. Ramirez avers that Junior was moving around like he was in pain. Another officer then approached Junior with what Ramirez describes as a large black tube or object (later identified as a Taser), and prodded Junior with it. At this point, Junior began shivering and shaking and appeared to be in pain. According to Ramirez, the officers remained on the premises for another 20 minutes, and, during that period, no one appeared to render any medical assistance to the person.

Pinedo alleges that Junior was still alive when he was eventually placed in an ambulance and transported to the hospital, where he died the next day.

- 3 -

B

Pinedo brought this lawsuit against the City and Officers Robinson and Meltabarger, individually and in their official capacities, alleging federal-law claims under 42 U.S.C. § 1983 for violations of Junior's Fourth and Fourteenth Amendment rights, and under 42 U.S.C. § 1985(3).  He also asserted a number of state-law tort claims against the City and Officers Robinson and Meltabarger.  On the City's unopposed motion, the court dismissed the state-law tort claims against Officers Robinson and Meltabarger pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e) (West 2011).  The City also moved to dismiss the federal-law claims alleged in Pinedo's first amended complaint, and it separately moved to dismiss Pinedo's state-law claims.  In *Pinedo I* the court granted the City's motion to dismiss the state-law claims, concluding that they were barred against the City by sovereign immunity.  The court also granted the City's motion to dismiss Pinedo's federal-law claims. The court concluded that Pinedo's § 1983 claims must be dismissed because he failed to allege facts supporting the existence of an official custom or policy, or that the City Council had actual or constructive knowledge of a custom or policy or exhibited deliberate indifference to the risk that a violation of rights would result from that policy or custom.  The court also held that Pinedo had failed to allege facts sufficient to state a plausible claim for conspiracy under § 1985(3) or for a violation of the Fourteenth Amendment.  The court granted Pinedo leave to amend his federal-law claims, and he later filed his second amendment complaint.

The City now moves to dismiss under Rule 12(b)(6), contending that Pinedo has failed

- 4 -

in his second amended complaint to state a claim on which relief can be granted.  Pinedo opposes the motion.

## II

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive the City's motions, Pinedo's second amended complaint must allege enough facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Rule 8(a)(2)).  Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more

than "'labels and conclusions.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And "'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

III

The court considers first the City's motion to dismiss Pinedo's § 1983 claims.

A

A municipality is a "person" subject to suit under § 1983 under certain circumstances. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). Although a municipality cannot be held liable simply on a theory of *respondeat superior*, *id.* at 691, it can be held liable if a deprivation of a constitutional right was inflicted pursuant to an official policy or custom, *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Municipal liability requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

The first element requires that Pinedo adequately plead an official policy or custom. "[A] policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id.* at 542 (citing *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003)). Although a "single decision by a policy maker may, under certain circumstances, constitute

- 6 -

a policy for which a municipality may be liable[,] . . . this 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Id.* (citations, brackets, and some internal quotation marks omitted).  A custom is "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)).

   To satisfy the second element, Pinedo must adequately plead the identity of a policymaker with "final policymaking authority." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "A 'policymaker' must be one who takes the place of the governing body in a designated area of city administration." *Webster*, 735 F.2d at 841 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)).  "City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals. . . . [T]hey are not supervised except as to the totality of their performance." *Bennett*, 728 F.2d at 769.

   The third element requires that Pinedo adequately plead that the municipal policy or custom was the "moving force" of the constitutional deprivation, which requires a "high threshold of proof." *Piotrowski*, 237 F.3d at 580 (citing *Monell*, 436 U.S. at 694).  Pinedo "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of

federal rights." *Valle*, 613 F.3d at 542 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)) (internal quotation marks omitted).  He "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 411) (internal quotation marks omitted).  Simple or even heightened negligence is insufficient to meet the deliberate indifference requirement.  *Piotrowski*, 237 F.3d at 579 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 407).

## B

Pinedo points to three customs or policies of the City that he contends caused the violations of Junior's constitutional rights and form the basis of the City's liability under § 1983.  In count A of the second amended complaint, Pinedo alleges that the City is liable for Officers Robinson and Meltabarger's violation of Junior's due process rights under the Fourteenth Amendment and right to be free from unreasonable seizure under the Fourth Amendment because the officers were acting within the City's custom, policy, practice and/or procedure of using excessive force.  In count B, Pinedo asserts that the City "imposed a policy of allowing Dallas police officers to be inadequately trained to handle situations involving individuals with mental illness or cognitive impairments," and that the failure to "provide adequate training to its police officers regarding the use of deadly force reflects deliberate indifference and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens[.]" *Id.* at ¶¶ 166, 168.  In count D, Pinedo alleges that the City is liable for Officers Robinson and Meltabarger's violation of Junior's Fourth

Amendment right to be free from wrongful arrest, because in committing the wrongful arrest,

Officers Robinson and Meltabarger "were acting within the custom, policy, practice and/or

procedure of the City[.]" *Id.* at ¶ 173.  The City contends that Pinedo's § 1983 claims must

be dismissed because, although Pinedo identifies the Dallas City Council as the City's

policymaker, he fails to plead the identity of the City's *final* policymaker; fails to plead facts

sufficient to support an inference that there exists a persistent and widespread custom having

the force of official City policy; and fails to plead facts to support a rational inference of

legal causation.

C

The court first addresses Pinedo's claims in counts A and D that, in violating Junior's

constitutional rights, Officers Robinson and Meltabarger were acting pursuant to a City

policy or custom.  The court need only consider whether Pinedo has adequately pleaded facts

to support a reasonable inference of the existence of an official policy or custom.

1

"'Municipal liability for section 1983 violations results if a deprivation of

constitutional rights was inflicted pursuant to official custom or policy.'"  *Pogue v. City of*

*Dallas*, 2014 WL 3844675, at *3 (N.D. Tex. Aug. 4, 2014) (Boyle, J.) (quoting *Piotrowski*,

237 F.3d at 579).  A plaintiff's allegations regarding the policy or custom cannot be

conclusory, and they must contain specific facts showing the existence of such a custom.

*Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire v.*

*Arlington*, 957 F.2d 1258, 1278 (5th Cir. 1992)).  "A single incident unaccompanied by

- 9 -

supporting history will likely be an inadequate basis for inferring such a custom or usage unless the actor or actors involved had been given official policy-making authority." *Renfro v. City of Kaufman*, 27 F.Supp.2d 715, 717 (N.D. Tex. 1998) (Fish, J.) (citing *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339-40 (5th Cir. 1989)).  "'Boiler plate allegations of municipal policy, entirely lacking in any factual support that a municipal policy does exist, are insufficient.'" *Crow v. Cash Special Util. Dist.*, 2005 WL 1126826, at *2 (N.D. Tex. May 11, 2005) (Sanders, J.) (quoting *Baxter v. Vigo Cnty. Sch. Corp.*, 26 F.3d 728, 736 (7th Cir. 1994)).

To establish a custom, a plaintiff must demonstrate (and, at the pleading stage, must plausibly plead) "a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582 (citation omitted).

> If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.

*Webster*, 735 F.2d at 842.  "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather[,] . . . notice of a pattern of similar violations is required.  While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired[.]" *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (footnotes and citations omitted).

- 10 -

2

Pinedo's claim in count D that Officers Robinson and Meltabarger "were acting within the custom, policy, practice and/or procedure of the City" when wrongfully arresting Junior, 2d Am. Compl. ¶ 173, is based on nothing more than conclusory allegations that there existed an official City policy or custom that led to the wrongful arrest. As the court pointed out in *Pinedo I*, "Pinedo does not point to any prior instances of Dallas Police Officers' . . . committing wrongful arrests, that would indicate a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Pinedo I*, 2015 WL 221085, at *6. Pinedo's second amended complaint fares no better. Therefore, the court grants the City's motion to dismiss as to count D of Pinedo's second amended complaint based on his failure to plead that the officers were acting pursuant to a custom, policy, practice, and/or procedure of the City.

3

The court now turns to count A, in which Pinedo asserts that the City is liable for Officers Robinson and Meltabarger's violation of Junior's due process rights under the Fourteenth Amendment and his right to be free from unreasonable seizure under the Fourth Amendment, because the officers were acting within the custom, policy, practice, and/or procedure of using excessive force.

In *Pinedo I* the court dismissed Pinedo's claim that the City had a custom of DPD officers using excessive force that was so common and well-settled as to constitute municipal policy; Pinedo alleged only a single episode demonstrating the use of excessive force, and

he did not point to any prior instances where DPD officers used excessive force or committed wrongful arrests that would indicate a widespread practice. *Pinedo I*, 2015 WL 221085, at *6. In his second amended complaint, Pinedo pleads more than a single incident in which he alleges that DPD officers used excessive force: he asserts that, in the years 2008 to 2014, there were 25 shootings of unarmed individuals by DPD police, and he pleads in greater detail the facts concerning ten incidents that occurred between 2006 and 2014 that he alleges demonstrate a widespread policy and custom of firing lethal weapons at unarmed and non-threatening individuals and using excessive force. Of the ten incidents for which Pinedo provides any factual detail, at least two appear to have resulted in death, and another two involved the use of force against an individual with mental illness. The question the court must decide in the context of a Rule 12(b)(6) motion is whether these allegations are sufficient to enable the court to draw the reasonable inference that there exists a practice of DPD officers using excessive force that is so common and well-settled that it constitutes a custom that fairly represents municipal policy.

"There is no bright line rule for determining how many prior incidents are sufficient to establish a pattern of excessive force[,] . . . [and] [t]he number of incidents and other allegations necessary to establish a pattern representing a custom, on a motion to dismiss, varies among district courts in the Fifth Circuit." *Moreno v. City of Dallas*, 2015 WL 3890467, at *8 (N.D. Tex. June 18, 2015) (Boyle, J.). But "[w]here prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable

conduct is the expected, accepted practice of city employees.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Webster*, 735 F.2d at 842).

The court concludes that Pinedo's allegations are not sufficient to demonstrate a pattern of excessive force that represents a custom, policy, practice and/or procedure of the City. Pinedo alleges that, during the years 2008 to 2014, there were 25 shootings of unarmed individuals by DPD—an average of approximately four shootings per year. With respect to 15 of these incidents, Pinedo does not provide any factual detail regarding the circumstances of the shootings. The court will assume, without deciding, that the occurrence of four similar shootings or instances of the use of force per year is sufficient to demonstrate a custom or pattern of some type. Even so, the court cannot determine without any factual detail (other than that a DPD officer shot an unarmed individual) whether any of those 15 shootings involved the use of *excessive* force, and were sufficiently factually similar to permit the reasonable inference that there is a pattern by DPD officers of using *excessive* force. "When a plaintiff alleges excessive force during an investigation or arrest . . . the inquiry into whether [the Fourth Amendment right] was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan v. Cotton*, ___ U.S. ___, 134 S.Ct. 1861, 1865-66 (2014) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (internal quotation marks omitted). The mere fact that a police officer has shot an unarmed individual does not establish *per se* that the officer used *excessive* force. *See id.* For example, in the context of tense, uncertain, and rapidly evolving circumstances in which

- 13 -

split-second judgments are required, the officer may have formed the reasonable belief that the unarmed individual was in fact armed and intended to kill or injure the officer or a third party. Pinedo provides no facts from which the court can infer that these 15 incidents involved the use of *excessive* force rather than force that was reasonable under the specific circumstances.

Pinedo pleads limited factual detail regarding the other ten instances occurring between 2006 and 2014 that he contends demonstrate a pattern of DPD officers' use of excessive force. Some of these incidents are factually distinguishable or lack sufficient facts from which the court can reasonably infer that the force was *excessive*. For example, Pinedo alleges that, on August 10, 2014, an unarmed suspect was shot multiple times when he advanced toward a police officer. The fact that the suspect advanced toward the police officer could justify the use of force, depending on other relevant facts and circumstances. Pinedo also alleges that, on November 8, 2010, DPD officers fired 23 shots at an unarmed man because he claimed to have a weapon and made threatening gestures, and that on June 29, 2010, Dallas police shot and killed a burglary suspect after he pointed an object at police. Again, depending on the specific circumstances, the use of deadly force may not have been excessive. And in citing two other incidents to support the claim that the DPD has a widespread practice of using excessive force, the second amended complaint is devoid of any indication that police used any excessive, deadly force. *See* 2d Am. Compl. ¶ 94 (describing incidents on April 2, 2012 and October 18, 2011, in which suspects were unable to breathe after police officers placed them in handcuffs). Absent a greater level of detail, the court

cannot reasonably infer that there is a widespread practice of DPD officers using excessive force.

Although Pinedo has alleged that 25 shootings of unarmed individuals occurred over a period of six years, he has only pleaded factual details concerning ten of them.  Even if the court assumes *arguendo* that all ten present factual circumstances that are similar to the facts of the instant case, ten incidents occurring over a six-year period in a city the size of Dallas—on average, about 1½ per year—are numerically insufficient to support an inference of a persistent and widespread practice of the use of excessive force.  *See, e.g., Moreno*, 2015 WL 3890467, at *9 (holding that "facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuses, especially without any further context[.]").

Accordingly, the court grants the City's motion to dismiss count A of Pinedo's complaint.[2]

D

The court now turns to Pinedo's claims in count B that the City "imposed a policy of allowing Dallas police officers to be inadequately trained to handle situations involving individuals with mental illness or cognitive impairments," and that the failure to "provide

---

[2]The City also moves to dismiss Pinedo's claim in count A to the extent that he seeks to assert an excessive force claim under the Fourteenth Amendment, contending that it is settled that the Fourth Amendment's reasonableness standard controls the analysis of all claims of use of excessive force in connection with the seizure of a person.  Because the court is dismissing count A for the reasons already explained, it need not reach this basis for the City's motion.

adequate training to its police officers regarding the use of deadly force reflects deliberate indifference and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens[.]" *Id.* at ¶¶ 166, 168.

1

Failure to train is a separate theory of municipal liability, *see, e.g., Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010), but the same standard applies both to a failure to train claim and to a municipal liability claim, *see, e.g., Valle*, 613 F.3d at 544 (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)). To plead a plausible claim, Pinedo must allege facts that enable the court to draw the reasonable inference that "(1) the training procedures were inadequate; (2) the city's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [Junior's] injury." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) (citing *Conner v. Travis Cnty.*, 209 F.3d 794, 796 (5th Cir. 2000)). "Deliberate indifference" is a "stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," for which "[a] showing of simple or even heightened negligence will not suffice." *Valle*, 613 F.3d at 542, 547. "[T]o satisfy the second prong and prove that the municipality acted with deliberate indifference, the plaintiff must generally 'show a pattern of violations and that the inadequate training or supervision was obvious and obviously likely to result in a constitutional violation.'" *Byers v. Navarro Cnty.*, 2012 WL 677203, at *16 n.39 (N.D. Tex. Mar. 1, 2012) (Fitzwater, C.J.) (quoting *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010)) (internal quotation marks and

brackets omitted).

2

In support of his claim that the City failed to train its officers to handle situations involving individuals with mental illness, Pinedo alleges that, according to a presentation titled "Crisis Intervention Training Mental Health Officer" made by the DPD before the City Council, 65% of DPD officer shootings involve mentally ill persons, and DPD needs to adopt new policies for interacting with mentally ill persons in order to avoid civil liability; that "the City . . . failed to properly train its officers to interact with mentally ill persons, or [persons] exhibiting the behavior of mentally ill individuals or individuals with obvious cognitive deficits," 2d Am. Compl. ¶ 100; that, according to statements made by Ron Pinkston ("Pinkston"), President of the Dallas Police Association ("DPA"), "officers don't know when they can use deadly force[,]" and officers would like more training, but their request for such has "fallen on deaf ears," *id.* at ¶ 96; and that DPD officer Christopher Watson ("Officer Watson") testified during a deposition in 2014 that officers do not follow the DPD's Standard Operating Procedures' specific instructions for police interaction with mentally ill individuals.  Pinedo also alleges two instances in which DPD officers allegedly used excessive force against individuals suffering from mental illness: one in which a DPD officer shot a mentally ill man who was standing ten to twenty feet away from the officer and made no movement toward the officer; and another in which a DPD officer used pepper spray on an individual suffering from mental illness and kicked him repeatedly.  *Id.* at ¶¶ 90, 94. Finally, Pinedo alleges that "the Dallas City Council acted with deliberate indifference and

disregard for human life by ignoring the requests for additional training and allowing business to go on as usual, with the Use of Force Continuum being ignored and/or abused, and innocent unarmed individuals with mental illnesses and/or cognitive impairments being killed or wounded." *Id.* at ¶ 108.

The City argues that Pinedo's allegations regarding its allegedly insufficient training are conclusory; that Pinedo has failed to plead facts that would enable the court to draw the reasonable inference that Officers Robinson and Meltabarger—or any other DPD officer—were insufficiently trained; that Pinedo identifies no deficiencies, much less systemic deficiencies, in officer training, supervision, or discipline; and that Pinedo has failed to plead any facts from which the court can reasonably infer that the City's final policymakers were even aware of any systemic deficiencies in officer training, supervision, or discipline, much less that they deliberately chose a deficient course of action from the available alternatives.

3

Pinedo has failed to plead sufficient facts to enable the court to draw the reasonable inference that, concerning DPD officers' use of force with respect to mentally ill individuals, the need for more training was so obvious, and the inadequacy of training so likely to result in the violation of constitutional rights, that the policymakers could reasonable be said to have been deliberately indifferent to the need. *See Valle*, 613 F.3d at 547.

First, Pinedo's allegations are insufficient to "show a pattern of violations." *Byers*, 2012 WL 677203, at *16 n.39. Although Pinedo alleges that 65% of DPD officer shootings

involve mentally ill persons, he only alleges factual details regarding two prior incidents, one occurring in 2012 and the other in 2013, in which a DPD officer allegedly used excessive force when interacting with an individual suffering from mental illness. *See* 2d Am. Compl. ¶¶ 90, 94. With respect to at least one of these two incidents, the facts that Pinedo pleads are insufficient to permit the court to draw the reasonable inference that excessive force was used. Pinedo alleges that, on October 11, 2012, an individual suffering from mental illness was pepper-sprayed and kicked repeatedly by a DPD officer, and that, shortly thereafter, the suspect suffered difficulty breathing and was pronounced dead. *See id.* at ¶ 94. Pinedo does not allege any facts regarding the circumstances of this encounter or the suspect's behavior that may or may not have reasonably justified the officer's use of force. The facts Pinedo alleges are therefore insufficient to permit the court to draw the reasonable inference that *excessive* force was used in this incident, such that it could demonstrate a pattern of *excessive* force, much less that the facts of this case are sufficiently similar to those of instant suit. *See Tolan*, 134 S.Ct. at 1865-66.

Even if Pinedo had alleged sufficient factual details with respect to both of these incidents to permit the court reasonably to infer that they were similar to the incident involving Junior, pleading the occurrence of only two prior incidents involving the use of excessive force against mentally ill individuals is insufficient to permit the court reasonably to infer that there was a pattern of violations such that the City Council can be said to have been deliberately indifferent to the need for additional training. *Cf. Valle*, 613 F.3d at 548 (concluding that evidence that at least ten mentally ill people who were unarmed or carrying

screwdrivers or pieces of wood were shot by police officers was insufficient to establish pattern of similar violations).

Pinedo also alleges in support of his failure to train claim that two DPD officers made statements that demonstrate that DPD officers did not receive sufficient training on excessive force.  He alleges that Pinkston, President of the DPA, stated that "officers don't know when they can use deadly force[,]" and officers would like more training, but their request for such has "fallen on deaf ears," *id.* at ¶ 96; and that DPD Officer Watson testified during a deposition in 2014 that officers do not follow the DPD's Standard Operating Procedures' specific instructions for police interaction with mentally ill individuals.  These statements are insufficient to permit the court to draw the reasonable inference that the City Council was deliberately indifferent to a need for more or better training. To state a plausible claim for municipal liability on a theory of failure to adequately train, Pinedo must allege facts that permit the court to draw the reasonable inference "that the inadequate training or supervision was obvious and obviously likely to result in a constitutional violation.'" *Byers*, 2012 WL 677203, at *16 n.39 (quoting *Brown*, 623 F.3d at 255) (internal quotation marks and brackets omitted).  Although these statements suggest that DPD officers would like more training, the mere fact that DPD officers would like more training regarding the use of force does not demonstrate that they are therefore using excessive force in their interactions with mentally ill individuals, much less put the City Council on notice that any lack of training would be "obviously likely to result in a constitutional violation." *Id.*

Finally, Pinedo cites a number of presentations made by a DPD representative to the

City Council to support his claim that the City failed to adequately train its officers. But one of the documents on which he relies actually demonstrates that the training provided to DPD officers is more extensive than state law requires. *See* 2d Am. Compl. ¶ 89 n.14 (citing David O. Brown, Chief of Police, *Dallas Academy Basic Training Unit*, slide 2, Dallas City Hall (Mar. 26, 2012) http://www3.dallascityhall.committee_briefings/briefings0312/PS_DallasPoliceAcademy BasicTrainingUnit_032612.pdf (describing "how the Dallas Police Academy far exceeds state requirements related to training peace officers")). Pinedo does not allege that the state training requirements are inadequate; in fact, he cites the state-mandated law enforcement training curriculum as an example of the training DPD officers should receive. Compliance with state requirements for training undercuts a finding of liability under a failure to train theory. *See Zarnow*, 614 F.3d at 170-71 ("We consider compliance with state requirements as a factor counseling against a 'failure to train' finding.") (citing *Conner*, 209 F.3d at 798); *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010) ("[W]hen officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate.") (citing *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)).

The court concludes that Pinedo has failed to allege facts that permit the court to draw the reasonable inference that the City's final policymakers were deliberately indifferent in adopting a deficient training policy regarding DPD officers' use of force with respect to mentally ill individuals. Accordingly, the court dismisses Pinedo's § 1983 failure to train

claim alleged in count B.

IV

The City moves to dismiss Pinedo's conspiracy claim under 42 U.S.C. § 1985(3), contending that Pinedo fails to plead any operative facts that would establish a conspiracy.

Section 1985(3) enables a person who is injured by a conspiracy to deprive him of equal protection of the laws, or of equal privileges and immunities under the laws, to recover damages.  To establish a § 1985(3) claim, a plaintiff must demonstrate that:

> (1) the defendants conspired (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and (3) one or more of the conspirators committed some act in furtherance of the conspiracy; whereby (4) another person is injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by a racial animus.

*Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 n.12 (5th Cir. 2001) (quoting *Wong v. Stripling*, 881 F.2d 200, 202-03 (5th Cir. 1989)).

As the court noted in *Pinedo I*, it is unclear whether Pinedo actually intends to plead a claim for relief under § 1985(3), because he only mentions the statute as a source of jurisdiction.  *See* 2d Am. Compl. ¶ 6; *Pinedo I*, 2015 WL 221085, at *8.  To the extent Pinedo does intend to plead a claim under § 1985(3), he has failed to allege facts regarding any of the elements required for a conspiracy claim under § 1985(3).

Accordingly, the court grants the City's motion to dismiss Pinedo's § 1985(3) conspiracy claim.

- 22 -

V

The City also moves to dismiss Pinedo's wrongful death and survival claims against the City. These claims derive wholly from the causes of action that Junior could have asserted for his own injuries had he lived. *See Delesma v. City of Dallas*, 770 F.2d 1334, 1339 (5th Cir. 1985). Because the court has dismissed all of Pinedo's substantive claims against the City, the court also dismisses his wrongful death and survival claims against the City.

\* \* \*

For the reasons explained, the court grants the City's motion to dismiss, and it dismisses this action against defendant City of Dallas with prejudice by judgment filed today. Because the court concludes that Pinedo has failed to state a claim on which relief can be granted against the City, the judgment of dismissal includes the dismissal of Pinedo's claims against Officers Robinson and Meltabarger in their official capacities.[3]

**SO ORDERED**.

August 25, 2015.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[3]*See Wright v. City of Garland*, 2014 WL 1492356, at \*1 n.5 (N.D. Tex. Apr. 16, 2014) (Fitzwater, C.J.) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1983)) ("A § 1983 action against [an officer] in his official capacity is a suit against the City itself.").